The next case on today's docket is the case of the people of the state of Illinois, and I am going to have trouble with this name, so perhaps it's Oduwole, and we have Sarah Shrump for the appellant, and we have Sharon Shanahan for the appellate. So you may begin, Ms. Shrump. May it please the Court. Counsel, I am Sarah Shrump from Northwestern University School of Law, and along with my co-counsel, Jeffery Dangin and Steve Art, we represent the appellant, Tosin Oduwole. This Court should vacate Oduwole's conviction for attempting to make a terrorist threat for three reasons. First, it rests on an unprecedented violation of the First Amendment and due process. Second, his conviction also rests on a failure to prove the elements of the offense beyond a reasonable doubt. And third, this case began as a result of an illegal warrantless search in violation of the First Amendment. Before I dive into the legal issues, though, I'd like to just take a moment to talk about my client, Tosin Oduwole. It's undisputed that he was described by everyone as a peaceful and nonviolent person. He was also an aspiring gangster rap artist, with everything that that entails. He wrote reams of lyrics everywhere. The only evidence in this case about the piece of paper found in the car is that it, too, constituted the formative stages of rap lyrics. Tosin also, true to that particular genre of rap music, was keenly interested in guns, and he wrote violent lyrics. He purchased four guns, legally, with a FOID card and through a federal firearms licensee. He never possessed those guns. In short, he is imperfect. Perhaps he made some poor choices, and he certainly wasn't sensitive to how things might look. But he wasn't an attempted terrorist threat maker. Yet now he sits in jail serving a five-year sentence, and I'd like to talk about how that happened and why it cannot stand, because it violates the most fundamental principles underlying the First Amendment, and it rests on a total failure to prove the elements of the offense. Now, it's hard to fault the SIUE police for being cautious in the wake of Virginia Tech, and I have to think that everyone in this room is considering the horrific events of last week as they listen to the arguments now, but as hard as it may be to separate the Connecticut school shooting from this case, it would be wrong to equate what happened there with what happened here. The reality is that no amount of good police work can protect society from random and horrible acts. What we can protect, though, is our precious constitutional rights that are always tested, taxed, and narrowed in the face of exigency and greed. And that's what is at issue here, preventing well-intentioned caution from transforming into a zealousness that presupposes somebody's guilt and violates the most fundamental rights under the Constitution. Whatever the police did, though, the fact is that the state never should have prosecuted Tosin for his uncommunicated thoughts. That it did so, despite its repeated concessions that his speech was never communicated, now leaves this court with the task of remedying a series of reversible errors. It's critical to emphasize the far-reaching implications of this case that goes far beyond this defendant and strikes at the very heart of the core principles underlying our constitutional system of government. When the First Amendment is at stake, there is no room for presupposition or for the state to impose its own characterization of the defendant's words. When the state decides to take away a person's liberty based on his speech and subjects him to the burden, expense, and embarrassment of trial and arrest and imprisonment, then our Supreme Court has instructed us to take great care. This kind of prosecution cannot happen haphazardly or unblinkingly. It will chill speech. People will opt to remain silent because they won't know whether or not they will end up in jail. So I'd like to turn specifically now to the First Amendment argument in our case, and I'd like to narrow and clarify the questions facing this court. It's undisputed that the piece of paper in the car constituted speech, so the threshold question facing this court was whether it was legal protected speech or illegal criminal speech. The baseline presumption is that speech and private thought lie well within the protected waters of the First Amendment, so we start there. If it's rap lyrics, then it's artistic expression and it's protected, and this court need go no further to overturn otherwise conviction. And the only evidence in the case unrebutted by the state is exactly that's what that was. But even if it's not rap lyrics, then it's still private thought, and the question then becomes what could possibly transform this legally protected speech, this piece of paper which was the only thing that formed the basis of the indictment in this case? What transforms this piece of paper into criminal speech? And the only way that that happens is when the Supreme Court carves out a narrow exception from the realm of free speech, and the exception at issue here, of course, is the true threat doctrine. So the final question facing this court with respect to the First Amendment issue is what interpretation of this crime of conviction, attempt making a terrorist threat, satisfies the delicate and important balance between free speech, the presumptively free speech, and protecting against the harm that some speech causes? And the answer with respect to true threats must be actual communication is required as a matter of law before speech may be deemed a true threat. And this is true for three reasons. First, all of the cases say so. All of the cases dealing with true threat from Virginia to the black onwards say that a threat is not a threat unless it's communicated. The second reason is more of a fundamental reason, and that is because the Supreme Court simply doesn't impinge on free speech. It doesn't carve out exceptions without an important and narrowly drawn purpose. The purpose underlying the true threat exception and the explicit evil that that exception is designed to prevent is fear in the listener. It doesn't want to engender fear among people. This narrowly drawn purpose is not and cannot be satisfied without communication because there can be no fear if the words are not heard. So any conviction allowed without communication upsets this delicate balance that the Supreme Court has struck between free speech and preventing harm. The third reason why actual communication is required for a true threat is that the state hasn't provided any other reasonable, objective way to distinguish between private thought and true threats. How else can private thought be transformed into a legal speech? I suppose one way to do that is to do what the prosecutors did here and just simply presume that it's a threat. But if that's allowed, then this crime of conviction is void for vagueness and overbroad. It's standardless. It's subject to the unfettered discretion of law enforcement and prosecutors and juries to simply decide. And that's something our Constitution flatly prohibits. So in fact, the only way to ascertain a true threat from other kinds of speech is through the objective measure of communication. And this is true whether we're talking about an attempt crime or a completed crime. Because again, you only discern this by going to the narrowly drawn categories, the narrow exceptions. And in this case, that hinges on communication, whether it's an attempt or a completed crime. Because there was no communication in this case, indeed because the state conceded that there was no communication, Oduwale's conviction must be overturned as violating the First Amendment. Second, this crime of conviction, if allowed to stand, would also violate due process. The state's theory, as evidenced in its brief, is plagued with fatal inconsistencies. And I'd like to explain that a little bit. If we accept the state's First Amendment theory, that Virginia v. Black stands for nothing more, not communication, but nothing more than an intent to communicate, meant to communicate that language that said Virginia v. Black. If that doesn't require communication for a true threat, then how can you layer on attempt on top of that without it being void for vagueness or overbroad? In such a case, the elements of that offense would be an intent to intend to communicate. And who could possibly know what that means? No one really could. This crime would actually capture loads of protected innocent conduct that people would never expect to be criminal. We identified a bunch of hypotheticals in our reply brief, and those fall squarely within this definition of the crime. Writing in your diary, a law professor's final exam typo, laying your brief on the seat of the car. All of those would be in danger here, and they all are void for vagueness as a result. So recognizing this, the state then offers a totally different theory in its void for vagueness section in its brief. On page 17 of its brief, it lists all sorts of elements that it claims must be proven by the state. And so therefore, there's reasonable notice, it's not subject to discriminatory enforcement, and it cannot be unconstitutionally vague or overbroad. Because, says the state, look at all these elements that must be proven. But if that's the case, then Oduwale's conviction must be overturned on insufficiency grounds. Because all of the elements that the state identifies on page 17 of its brief, all of those hinge on communication. So by the state's own admission, the crime of conviction is either unconstitutional or there's insufficient evidence. Now third, I'd like to turn to insufficiency a little more specifically. Aside from the elements that are missing by virtue of the state's failure to prove communication by its concession that it did not exist. And those include an intent to intimidate, which really can't happen without communication. A target population, which requires knowing and communicating to that population. A knowing threat, which as I've discussed by definition requires communication. And actually causing fear, which is another element of the offense that can't happen without communication. The evidence was also insufficient because the state effectively concedes in its brief that it had no evidence of Oduwale's intent. In its response brief, the state abandons the only proof that it had identified during closing arguments below as proof of Oduwale's intent. Things that we in our opening brief dismantled and said could never satisfy its burden to prove a threat. Indeed, it abandons the element of intent entirely. In its insufficiency section in its brief, the state doesn't mention Oduwale's intent even once. Not once. And I think that's telling. The state can't simply skip over an element of the offense or its burden to prove it beyond a reasonable doubt. But that's what it did below and that's what it continues to do here. And the state didn't prove any substantial step. Our Supreme Court in the Smith case has said that a defendant only acts with a substantial step when he comes within a dangerous proximity of success of completing, committing the underlying crime. That's what's required. Would it be your argument that the only type of substantial step that would count would be an attempt to communicate? You're saying without some attempt to communicate the threat, there can be no substantial step toward communicating, toward the threat? You need to, there are other things that could potentially serve as a substantial step, I would think. Okay, that's what I was trying to get at. So if, so are there, could there be evidence that would constitute a substantial step toward this crime absent an attempt to communicate? You do need to have communication. But there are probably other things that could, there are other facts and circumstances that the court would look to depending on. But you need communication in this case. Okay, so you do have to have some attempt to communicate in order for there to be a substantial step. Yes, you have to have some communication, whether it gets to the intended audience or to a third party. I'm sorry if I missed it. No, that's what I'm trying to get at. Your argument would be that there cannot be a substantial step toward the commission of the offense without there being some attempt to communicate. As you argue in your brief, maybe it gets to the wrong person or whatever. Exactly. If there is some attempt to communicate the threat, there can't be an attempt to issue a terrorist threat. Yes, and I think that that makes sense, Your Honor, because, you know, the crime of making a terrorist threat is a narrow body of criminal behavior that was designed explicitly to capture conduct short of committing the actual crime. So it's a fairly narrowly drawn set of circumstances. Then when you layer attempt onto that, it narrows the class of conduct that's really captured by it even more. So, yes, communication is essential to that, even though it does create a narrow band of conduct that is criminal. Well, the definition of the crime itself is a communication. Yes. The crime itself. But your argument would be nothing short of an attempt to communicate could be an attempt to make the terrorist threat. That's right. Even though it does seem narrowly drawn, I think that that is the only way to save it from unconstitutionality, Your Honor. Okay. So just getting back to the substantial step. I think, you know, what we saw in the State's brief is it's recognizing that all of the evidence that it offered, a standing alone, each one standing alone is insufficient to constitute a substantial step, primarily because there's no communication. But then what the State does is it tries to lump everything together and say, okay, you know what, that's good enough. Despite this recurring theme, it simply isn't good enough. And none of its evidence constitutes a substantial step in this case. So this Court should reverse Oduwale's conviction on this ground as well. Fourth, and finally, I just want to touch briefly on the Fourth Amendment search that started this entire case. Can I ask you a question? Oh, sure. Was the car locked? Yes. It was, Your Honor. So that the police had to use whatever means they used of getting into the... Yes, Officer Todd Schmidt testified that they used a tool that they had to get in. Okay. Now, the Supreme Court tells us to evaluate a Fourth Amendment search by looking at all the facts and circumstances. Doing that clearly leads to only one conclusion, and that this so-called inventory search was nothing more than a pretextual investigatory search. And here are the relevant facts and circumstances. It's undisputed that there was an ongoing investigation of my client in the days leading up to the tow and search. It's also undisputed that there was a coordinated effort among three branches of law enforcement. The SIUE police, the Wood River Police Department, and the ATF. Was the SIU police in touch with the ATF, or were they just in touch with Wood River? It's not entirely clear from the record, but my reason is that they had been in contact... ATF contacted Wood River, and Wood River was in contact with SIUE. And that Wood River and ATF were working together. SIUE was assisting in those days leading up to the inventory search of tow. They were surveilling the car for evidence of criminal activity in and around it in those days leading up to it. Detective Weissenborn even went to the SIUE credit union to check on whether the check that started this whole thing... whether that had been cashed. So he was joining those other branches of law enforcement well before the day of the inventory search. Is there any evidence that either ATF or Wood River Police Department suggested in any way... or made any suggestion that SIUE police should go to this abandoned vehicle and do anything?  Is there any evidence that they suggested or directed or were involved in any way with the decision by the SIUE campus police... to go to this quote-unquote abandoned vehicle and do anything? It's not clear from the record, Your Honor. But what we do know, and the relevant portions of the record are really about pages 68 to 78 of the suppression hearing transcript... where Detective Weissenborn talks about this in some detail. It appears that they first became aware of it on Monday the 16th, July 16th. And that was because Wood River called SIUE police. Now it's not clear to what extent they were asking them to look at it or anything else. But what we do know from Detective Weissenborn's testimony on those pages is that he was putting that department out there to assist. He said, we'll get in there and help whichever way we can. If we can do that, if we can gather evidence for another branch, we can do that. That's a direct quote actually, we can do that. So whether it was... We can do that, gather evidence? We can gather evidence to help. The last part is a quote, I don't know the full quote. But whenever we can do that and gather some evidence for another thing, we can do that. And so he admitted that they were, you know, helping out on this investigation, whether it was by request or just on their own initiative. But the way I understand it is, I mean, the call from Wood River simply was, we spotted his car, it's parked there. Exactly. And is there any evidence that they suggested, like, if you can figure out a way to get in the car, that'd be good? Or do you have, did they ask, do you have a policy about abandoned cars that would let you get in? I mean, there's no evidence of any conversation like that. No, we didn't have any evidence from Wood River about that. And ATF, neither ATF nor Wood River Police Department were present at the scene of the search. Not when the tow was affected. When they went to arrest our client, yes, they were there. They were all there. So they were surveilling Oluwole's car for two days. And they said, admittedly, looking for signs of criminal activity in and around the car. So that, too, leads to a presumption of pretext, or at least evidence of a pretext. And the final piece of evidence, or the final fact and circumstance that we look at is the fact that once they did affect the inventory search in tow, and they got in there, they didn't even inventory everything that was in the car, which undercuts the purpose of even doing an inventory. The purpose, as they said, was to protect owners and the police from claims of loss. Yet they got in there, and they didn't even follow their policy by inventorying everything they were supposed to by their own policy, inventory by model and serial number. They didn't do that. And so that is further evidence of pretext, that they were really just investigating this boy, and they got into the car, and they wanted to poke around. And because it was a pretextual investigatory search and not a mere inventory search, they were supposed to get a warrant, and they didn't. And so the search was illegal, and the piece of paper should have been suppressed. So a lot of things did go wrong in this case, and each error was fundamental and reversible in its own right. So for these reasons, we ask that you vacate Odewale's conviction. Thank you, Ms. Trump. You'll have the opportunity to speak, Barbara. Okay. Thank you, Your Honor. Ms. Shanahan. Thank you. May it please the Court. Counsel. My name is Sharon Shanahan, and I represent the people of the state of Illinois. SIU Edwardsville police found a note in the defendant's car. The SIUE police thought it was a terrorist threat. According to the defendant, here before you today, at trial, in the pretrial hearing, this was rap lyrics. That was his theory of the case. Just to make sure I understand, the defendant did not testify. No. So he didn't testify that it was rap lyrics. No, but it was certainly the theory of the case, all the way down to the bringing in of an expert on rap lyrics. There was a friend who testified, a friend of the defendant's, as I understand it, and then also an expert testimony. Okay. So the theory of the defendant's case is that this is not a threat. This is rap music. Keep a vest for protection from the barrel of a Sniffin' Wesson. All my niggas in the pen, here we go again. Ain't nothin' separatin' us from a Mac-10. That's rap music. Send $2 to PayPal account. If this amount doesn't reach $50,000 in the next seven days, then a murderous rampage similar to the VT shooting will occur at another highly populated university. This is not a joke. That's not rap music. That's what the police thought. That's what the state's attorney thought. That's what the judge thought. And most importantly, that's what the jury thought. That's not rap music. It's a threat. Ms. Shanahan, if I could interrupt you just a second. The state has taken the position in its brief that an intentional communication is not required for making a threat. That there does not have to be any communication in order to satisfy this offense. Do you take that position? No, Your Honor. Okay, because it's saying that in your brief. It said that the completed intentional communication is not necessary for the crime of attempt at making a terrorist threat. So you would agree that some communication, and I'm not necessarily limiting it to oral communication. Passing of a note, for example. But some step would be required in order to complete the elements of the crime? Some action, some communication, as it's called. Communication, first of all, let's make something clear here. Communication to someone other than the person that it's intended for is not attempt threat. It is completed threat. If it is communicated to someone other than the intended victim. Even the defendant admits that in his brief. Okay, wait a minute. I don't understand that because let's say you write a threatening note. And you give it to your friend and say take this to the dean of the law school or whatever. But instead he takes it to the police. And the threat is to do something at the law school. How has that become a completed threat? That is a completed threat because it was communicated even though not to the person intended. And as I said, that is commonly accepted. It is stated in defendant's, although the defendant contradicts himself in his brief. On one hand he says that communication to a third party, not the intended person, is a communicated threat. And another point in his brief he says it's not. I think how was it communicated to the third party here? No, I'm saying that would be a complete threat. How was there an attempt to communicate it to a third party? Well, let's look at the only two cases that I was able to discover that deal with the crime of attempt making a threat. That actually discussed what do you have to do to attempt. Now, I mean, defendant says today this is the law. They present in their reply brief what they call monolithic law of what is a threat. But they don't talk about a single case. They have not presented a single case that says communication is required for the crime of attempt making a threat. Two cases cited in the state's brief do. Supreme Court of California, people versus Toledo. And the Supreme Court says, and I am quoting here. For example, if a defendant takes all the steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before its delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat. Senator Lee. I understand that. And I guess that's the problem I'm having is in Toledo there was some activity beyond somebody writing a note, right? In that case there was something else. And the briefs are replete with the statement that the state could never show that the words on the paper were ever delivered, given, shown, whatever, to anybody else except the inside of the car. Perhaps a better analogy would be the Evans case out of Washington, D.C. In that case, a man was sitting in a courtroom talking to his friend and inadvertently overheard by the police was a threat. They certainly didn't mean for the police to overhear it, but they did hear it. That's an oral threat. I agree. Overheard by police officers, and certainly there's no intent that the police should hear it. In this case, the threat is written. Not intentionally given to police, but given to police by abandoning his car and leaving the threat in there. The oral threat that is inadvertently overheard and the written threat that is inadvertently discovered are the same thing. And Toledo says, if a threat, excuse me, Evans says, if a threat fortuitously goes unheard, the person who utters it is guilty of an attempt, not the completed offense. Similarly, if the written threat goes unread, then the person who utters it is guilty of attempt, not completed threat. It has to obviously come to someone's attention. If it had remained in Oduwole's car, never seen by anyone, then we wouldn't be here today. But it was inadvertently, I mean I think theoretically you could come up with some kind of scenario where he planned to have the police discover it this way. But I don't, I think that's a tremendous stretch. The inadvertent discovery of the written note in this case to me is analogous to the inadvertent overhearing of the note, I mean of the threat in Evans. Are you saying that if the police had not inadvertently discovered this note in the car, he would have had to have done something else for this to have become a crime? Well. You said we wouldn't be here today. Yes. Yeah, I mean. And what would that other thing be and is that necessary then for there to be a substantial step? I think we are getting beyond the scope of the facts of this case. The fact of the matter is he wrote this. Well, no, I don't think we are because I mean their whole argument is that he has to, there has to be some attempt at communication that, you know, somehow gets out there and that's their whole argument. This was never communicated. It was something he wrote and it was in his car. He never tried to get it to anybody else and therefore there was no attempt. And I hear you saying, you know, if the police hadn't inadvertently come across this, we wouldn't be here today. Well, them inadvertently coming across it isn't about anything he did. You see what I'm saying? He wrote it. Well, how is that different than his computer? It's not. So you're saying that if the police, for whatever reason, some, let's say there was a suspicion of him being a hacker or something, got into his computer and found this deleted, similar information, that that would have been an attempt to communicate as well? I think that... And not a private thought or private writing? Well, we need to look at what has to go along, I mean the other steps, but if there are other steps, what it is is to fall short of the completed steps. So I guess my answer to, I mean the completed crime, my answer to you is in an age where a deleted computer file is very easily, I mean we say it's deleted, but was it downloaded to a thumb drive? Was it uploaded to cloud storage? Was it put on a CD? It could have done many other things that would have made it the file. It was a private communication. But a threat is never a private communication. Well, you're presuming it's a threat. If he writes something in his diary or puts it in the closet, like the case, what was the Fifth Circuit case, Porter v. Ascension Parish, that said he left a violent drawing in his closet but had not communicated it to another person, and the court explained that there must be some communication or attempted in order for it to be a true threat? Well, first of all, that person was charged with a completed crime of threat. Second of all, there are other cases that there's another case, and I'm sorry that the name is cited in our brief, but the name slips my mind, in which a teacher inadvertently discovers a writing about a dream, and the dream is a threat. And that same district court found that to be a completed threat. So, going back to the question of the computer file, the only thing that had to be done for that computer file would be, it's made, the Movie Maker files are made to put on YouTube. I mean, that's why you would create a Movie Maker file, not necessarily, there are, I think, others out there now, but that's what it's made for. And so, all that had to do to be a completed threat would be to click on the button to upload it to YouTube. Hadn't it been deleted? I'm sorry, hadn't it been deleted? It had been deleted from the hard drive of the computer, but as I say, that doesn't mean that it wasn't deleted, that it wasn't saved in one of the plethora of other ways. There's no proof of any of that, though. Correct, but I'm just saying that deletion does not, you cannot infer from deletion that Mr. Oduwole decided, oh, I don't want this anymore, I'm throwing it away. I don't think you can make the assumption that I'm throwing this away because I deleted it. I don't think you can make that. But you can infer that because he wrote something, he was going to communicate it as a threat? When you combine it with the guns, when you combine it with the PayPal account that is specifically referenced in both notes, when you combine it with the fact that he even tells people how to take out a PayPal account, when you combine it with all of these things, the only thing missing, if he had taken that note out of the car and posted it on a bulletin board in the SIU Edwardsville rec room, if he had taken the computer file and uploaded it to YouTube, you're not talking about attempt making a terrorist threat, you are talking about making a terrorist threat. By definition, an attempt crime is incomplete. By definition, something is missing. What I see as missing is I don't follow how you get to his intent to communicate by bootstrapping these other actions that may or may not have legal and innocent reasons. What has he done by locking this writing in his car that shows you that he intended to communicate it? Not that he completed it. He has to have some substantial step towards attempt to communicate. I don't follow where just his thinking these thoughts were not that much removed from extracting it from somebody's brain, their thoughts versus writing it down, as long as they intended to be protected speech and not intending to somehow communicate it. I don't follow how you get to that, not the completed act, but the intent. The intent to communicate, first of all, as I said, it was communicated. I mean, it was read by the police. So it was communicated just as in Evans, it was overheard by police officers, whether that's your intended recipient or not. Second of all, I think you can find that intent to communicate when you compare the written note and the computer-based note, because of the amount of detail involved in it, because of the reference to Virginia Tech, because of the reference to the specific PayPal account, which the evidence shows he had his girlfriend set up for him. He'd gone a lot farther than just writing the note. If there was just the note, no purchase of guns that could fire off 70 shots without stopping to reload, no setting up the PayPal account that he refers to in the computer, no, the computer file, he had added sound effects and pictures. Now, those sound effects and pictures were not in the deleted file, but the names of them were. And the names of them are like Machine G and Guns something. I mean, they're clearly sound effects, not songs, sound effects that are, I think it's pretty clear that they are the sounds of guns firing. The pictures, keep in mind that this thread says that this will happen like Virginia Tech at another prestigious university. The pictures that were deleted from the file had names like Harvard logo, and remember, all prestigious universities throughout there. So it took a lot of time and work to develop this movie maker file. There's nothing, you can even tell how long the sound effects are. They're not long enough to even remotely be music. And as I say, their names indicate that they are the sound effects of guns being fired. The pictures are logos of prestigious universities. All of these things added together, the only thing missing is the actual completion of the act. So are you saying that a substantial step in this case could have been the development of the PayPal account? You're saying just the note and the PayPal account? Yeah. Would that be enough? The note as it, I think this is kind of a, let me answer your question directly. If I'm hearing you correctly, it doesn't have to be that he communicated the note. It could be the circumstances surrounding what he said in the note. Oh, absolutely. That would be the justification for the PayPal account. I mean, was there a PayPal account at JMAC 21? Yes, there was. And the testimony from his girlfriend is that she asked him to set it up for him. I guess the other thing is the gun transactions. Are you saying that that could also be deemed a substantial step? Absolutely. If you look at the Park case that we cite in our brief, it essentially says that someone who takes steps to be able to carry a threat out should be taken far more seriously. In that case, the defendant had, there was evidence presented that he had gotten materials on how to build a bomb, that he had been reading about Ted Kuczynski, and there was a similar challenge in that case in which they said that all of this doesn't have anything to do with the crime. And the Seventh Circuit said being able to carry a threat out makes it far more likely that you intended to threaten. Could I have just a moment to conclude? You can make a statement to conclude your statement. During World War I, Justice Oliver Wendell Holmes said, In many places and in ordinary times, the defendant, in saying all that was said, would have been within his constitutional rights. But the character of every act depends upon the circumstances in which it is done. When a nation is at war, many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured, and no court shall regard them as protected by any constitutional right. World War I was not ordinary times, and right now is not ordinary times. As we found out in Columbine, as we found out in Virginia Tech, and as we found out last Friday at Sandy Hook, that terrorism is in our schools is a reality. People ask, what could we have done to prevent this? One answer, strictly enforce the laws that prevent terrorism. And I would ask you to affirm this to the jury. Thank you, Ms. Shanahan. Thank you, Your Honor. I just want to make a couple of points. First of all, as Justice Gates, as you pointed out, some affirmative act of communication must be required to be constitutional in this case. And the state seemingly now concedes that there must be some communication, or at least it came very close to saying that here today. And if that's the case, then his conviction must be overturned. Second, I just want to take issue with the state's point that we've cited no attempt cases that require communication. Footnote 4 in our reply brief on page 5 of our reply brief sets forth a number of those exact kind of cases. The third thing that I'd like to touch on is to just quickly distinguish the cases, the heart of the state's cases, which is the Toledo case, which you, Justice Chapman, referenced, and the Evans case. Those cases are beyond completely distinguishable. Toledo involved actual threats. He pointed a scissor and yelled at scissors and told his wife he was going to kill him. The only reason that that case was deemed an attempt was because the wife then later got on the stand and claimed that she was not afraid. And that was another element of that offense that needed to be proven, and they couldn't, so they did an attempt in that case. But there is certainly the dicta that the state quotes from that case does not stand for the facts of the Toledo case or the fact that communication actually happened and was required in that case. As for Evans, they take this, again, dicta, the threat fortuitously goes unheard or if it's inadvertently communicated. That is not what happened in Evans. In Evans, as you said, Evans turned to the person behind him and said, I'm going to kill that witness. The fact that the police inadvertently overheard it had nothing to do with the threat or whether it was communicated or anything else. It was communicated to the person behind him. The inadvertent communication only went to how they caught him and heard it. But, and also, it's important to note that the D.C. statute at issue in Evans actually requires communication. So communication is not only factually present there, but legally required in the D.C. Court of Appeals. Let me ask you a question. The state argues it's a jury question whether or not a substantial step toward making it a terrorist threat has been proved. You know, why couldn't the jury say, you know, here's all the evidence. You know, he wrote the note. He ordered the guns. He set up the PayPal account, et cetera, et cetera, et cetera. Why couldn't they look at the totality of the circumstances and say, I'm convinced or we're convinced beyond a reasonable doubt that his intent was to make this terrorist threat? Well, for two reasons, Your Honor. First of all, you can't just have the intent. You have to have actual communication. And they couldn't make that finding here. The state in its brief says, oh, no, they determined that it was a threat. No, they couldn't have because they weren't instructed that they had to find communication. Because the way the circuit court interpreted the crime of conviction below obviated communication from it. And because the state conceded and built its entire case on the fact that there was no communication. So all this other evidence that the state has now been talking about towards the latter end of its argument is irrelevant. It's a red herring. It has nothing to do with this crime because there was no communication. The only thing. So you're saying that the communication has to precede the introduction of the evidence, the guns, the introduction of the evidence, the PayPal account. Well, the state, well, that would be the smart way for the state to state its case. I mean, it can't, it cannot. Does it have to? It has to have communication first. Yes. To precede it. Beg your pardon? To precede the introduction of everything else. I mean, without communication, there is no crime. Right. Bottom line. Bottom line. There is no crime without communication. And it's important to know. I mean, certainly, you know, if somebody's charged with attempted burglary and the evidence is that they wrote privately their plan for how to get in a house and they went out and bought some burglary tools and bought gloves and a sock cap and whatever, those kind of cases happen all the time. And juries listen to the evidence and determine what the person's intent was based upon the totality of the circumstances. Yes, but the difference in those kinds of cases is that there's not an underlying legal question that needs to be answered first. And you can't have a threat. The jury needed to determine whether there was a threat. And you cannot have a threat unless it's communicated for all those reasons that I said in my opening argument. So, for these reasons, and because the only thing that the state ever offered as theory of a threat in this case was the note, because that note was discarded and locked in his car and never communicated to another living being, this court should reverse Mr. Odewale's conviction. Thank you very much. Thank you. Thank you both for your arguments and reasons. We'll take a minute under advisory committee.